UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TRIDENT SEAFOODS CORPORATION, a Washington corporation,<br><br>     Plaintiff,<br><br>   v.<br><br>TRITON SEAFOODS LLC, a Washington limited liability company,<br><br>     Defendant. | No.<br><br>COMPLAINT FOR TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, UNFAIR COMPETITION, AND VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT<br><br>JURY DEMAND |

Plaintiff, Trident Seafoods Corporation ("Trident"), by and through its undersigned counsel, respectfully makes the following allegations for its Complaint against Defendant, Triton Seafoods LLC ("Triton"). These allegations are made upon knowledge with respect to Trident and its own acts, and upon information and belief as to all other matters.

## I.  PARTIES

1.  Trident is a corporation duly organized and existing under the laws of the State of Washington and having a place of business at 5303 Shilshole Avenue N.W., Seattle, Washington. It harvests, processes, and markets high quality seafood products across the globe.

COMPLAINT — 1
DWT 22902659v3 0064929-000376

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

2.      Triton is a limited liability company organized under the laws of the State of Washington.  Upon information and belief, its principal place of business is 4602 - 148th Avenue N.E., Redmond, Washington.

## II.      JURISDICTION AND VENUE

3.      This is an action for trademark infringement, false designation of origin, and unfair competition arising under the common law and the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and for violation of the Washington Consumer Protection Act, RCW Ch. 19.86.  Federal subject matter jurisdiction is founded on 28 U.S.C. §§ 1331 (federal question), 1338(a) (trademark), 1338(b) (related claims of unfair competition), and 1367 (supplemental), and 15 U.S.C. § 1121 (Lanham Act actions).

4.      Triton is located and regularly does business in this judicial district.  Triton has also committed acts of trademark infringement, false designation of origin, and unfair competition, and violated the Washington Consumer Protection Act by selling, distributing, advertising, and marketing seafood products in this judicial district.

5.      Venue is proper in this district under 28 U.S.C. § 1391.

## III.    TRIDENT'S RIGHTS IN THE TRIDENT TRADE NAME AND TRADEMARKS

6.      Trident is the largest seafood company in the United States.  It supports its operations with a fleet of harvesting, tendering, and processing vessels, a network of strategically-placed shore plants, and an extensive sales and distribution network.

7.      Trident has used the term TRIDENT as a trade name and trademark since 1973 and has spent considerable amounts promoting and protecting its brand.  It owns several U.S. trademark registrations for TRIDENT and similar marks (which, along with Trident's common law rights in these marks, are collectively referred to as the "**TRIDENT Trademarks**"):

COMPLAINT — 2
DWT 22902659v3 0064929-000376

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

| Mark | Reg. Number | First Use | Goods/Services |
|---|---|---|---|
| TRIDENT | 2,116,363 | 1973 | Processed seafood [IC 029] |
| *Trident ψ* | 2,116,397 | 1989 | Processed seafood [IC 029] |
| *Trident ψ* | 2,367,693 | 1989 | Processing of seafood for others [IC 040] |
| TRIDENT | 2,367,702 | 1973 | Processing of seafood for others [IC 040] |
| TRIDENT SEAFOODS NATURALS | 3,448,253 | 2007 | Seafood; surimi [IC 029] |
| TRIDENT SEAFOODS | 4,346,995 | 1973 [IC 029] 2008 [IC 005] | Dietary and nutritional supplements for humans and for animals; fish oils for human consumption for use as dietary supplements; fish oils for animal consumption for use as dietary supplements [IC 005]<br><br>Seafoods; edible oils; edible fish oils; nutritional oils for food purposes; edible oils and edible fish oils for use as ingredients in foods and beverages [IC 029] |
| *Trident ψ SEAFOODS* | 4,350,394 | 1989 [IC 029] 2008 [IC 005] | Dietary and nutritional supplements for humans and for animals; fish oils for human consumption for use as dietary supplements; fish oils for animal consumption for use as dietary supplements [IC 005]<br><br>Seafoods; edible oils; edible fish oils; nutritional oils for food purposes; edible oils and edible fish oils for use as ingredients in foods and beverages [IC 029] |

COMPLAINT — 3
DWT 22902659v3 0064929-000376

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

1   These registrations are valid and subsisting, and Registrations Nos. 2,116,363, 2,116,397,

2   2,367,693 and 2,367,702 are incontestable under the provisions of the Lanham Act, 15 U.S.C.

3   § 1065.  Copies of the registration certificates are attached as Exhibit A.

4        8.      As a result of Trident's long history—as well as the quality of the seafood

5   Trident markets and sells—the TRIDENT Trademarks are widely recognized throughout the

6   United States and the world.  The consuming public, both in the United States and worldwide,

7   has come to rely upon and look for the TRIDENT Trademarks to identify seafood products

8   originating from Trident.  As a consequence, the TRIDENT Trademarks symbolize valuable

9   goodwill and reputation.

10                     **IV.    TRITON'S INFRINGING ACTIVITIES**

11        9.      Upon information and belief, Triton was organized by Alexander Domnenkov in

12   2013.  According to its website, Triton, like Trident, engages in "fresh & frozen seafood

13   marketing, processing and consulting, trading, export, import, broker and bait sales."

14        10.     Triton promotes its products and services through (among other channels) its

15   website at www.tritonseafoods.com, which mimics Trident's domain: tridentseafoods.com.

16   Trident registered its domain in 1995, predating Triton's registration by 17 years.

17        11.     Triton's website offers many of the same seafood products under the TRITON

18   mark as Trident offers under the TRIDENT Trademarks.

19        12.     Trident competes with Triton and with other fish processing and fish marketing

20   companies both for procurement of seafood and for sales to customers.

21        13.     The similarity, both visually and aurally, between the terms TRIDENT and

22   TRITON has caused actual confusion and, given the nature and intensity of the industry, that

23   similarity is highly likely to give rise to further and even greater confusion among fishers,

24   suppliers, vendors, and customers.  Some of the people working in the industry in which

25   Trident and Triton compete speak English as a second language and may have even more

26   difficulty distinguishing between the highly similar words TRIDENT and TRITON than native

27   speakers of English do.

COMPLAINT — 4

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

## V.   TRIDENT'S ATTEMPTS TO RESOLVE THIS MATTER

14.     On September 25, 2013, counsel for Trident wrote to Triton demanding that Triton immediately stop all infringing activities.  The letter demand that Triton comply with Trident's terms by September 30, 2013.  A copy of the letter is attached as Exhibit B.

15.     On September 30, 2013, Triton replied that it denied infringement "based on international laws," but offered to sell the tritonseafoods.com domain name to Trident.

16.     On November 15, 2013, Trident sent a draft of this complaint to Triton with a final demand that it immediately stop all infringing activities.  To date, Triton has refused and continues to promote and sell seafood products and processing services under the TRITON mark.

## VI.   THE HARM TO TRIDENT AND THE PUBLIC CAUSED BY TRITON

17.     Triton's unlawful infringement of the TRIDENT Trademarks has caused irreparable harm to Trident's reputation and goodwill.  Trident will continue to suffer irreparable injury to its reputation and goodwill unless Triton is enjoined from continuing the conduct complained of, which injury cannot be adequately compensated monetarily.  As long as Triton is allowed to continue the acts complained of, Trident's reputation will continue to be damaged.

18.     Upon learning of Triton's infringing activity, Trident took immediate steps to notify Triton of its infringement and to seek Triton's help in mitigating damages.  Triton refused to cooperate with Trident's requests, and instead continued to market seafood products under the confusingly-similar TRITON mark.

## COUNT 1

## FEDERAL TRADEMARK INFRINGEMENT

19.     Trident realleges all preceding allegations of this Complaint as if stated herein.

20.     Triton's actions described herein constitute infringement of Trident's U.S. Trademark Registrations for the TRIDENT Trademarks listed in Paragraph 7 above, in violation of the Lanham Act, 15 U.S.C. §§ 1114 through 1118.

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

21.     Triton's actions were willful and intentional, making this an exceptional case pursuant to 15 U.S.C. § 1117.

## COUNT 2

### FALSE DESIGNATION OF ORIGIN UNDER THE LANHAM ACT

22.     Trident realleges all preceding allegations of this Complaint as if stated herein.

23.     Triton's actions described herein constitute false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a).

## COUNT 3

### COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

24.     Trident realleges all preceding allegations of this Complaint as if stated herein.

25.     Triton's actions described herein constitute common law trademark infringement and unfair competition in violation of the laws of the State of Washington and the laws of the other states of the United States.

## COUNT 4

### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT

26.     Trident realleges all preceding allegations of this Complaint as if stated herein.

27.     Triton's conduct described herein constitutes an unfair and deceptive act or practice and an unfair method of competition in the conduct of trade or commerce in violation of RCW 19.86.020 that has harmed Trident in its business and property.  Trident is entitled to recover damages, treble damages up to $25,000, and attorneys' fees pursuant to RCW 19.86.090.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Trident prays for relief against Defendant Triton as follows:

A.     Entry of preliminary and permanent injunctions enjoining Triton and its servants, agents, employees, successors and assigns, and all persons acting in concert with them, from using in any manner the TRITON trade name or trademark or any other trade name or trademark confusingly similar to the TRIDENT Trademarks;

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

B.      Ordering Triton to deliver up to Trident for destruction all goods, signs, advertisements, literature, business forms, cards, labels, packages, wrappers, pamphlets, brochures, receptacles, and any other written or printed material in their possession or under their control which contain or encompass the TRITON trade name or trademark; the TRIDENT Trademarks, any colorable imitations thereof, or any marks or trade dress confusingly similar to the TRIDENT Trademarks; or which contain any false or misleading representation of fact;

C.      Awarding compensatory damages sustained by Trident and profits generated by Triton as a result of the acts complained of herein pursuant to federal and state law, to be trebled in accordance with 15 U.S.C. § 1117 and RCW 19.86.090;

D.      Awarding Trident its attorneys' fees pursuant to 15 U.S.C. § 1117, RCW 19.86.090 and other applicable federal and state laws;

E.      Awarding Trident interest, costs, and such other relief as the Court may deem just and equitable.

## JURY DEMAND

Trident hereby demands a trial by a jury of all issues so triable.

DATED this 21st day of November, 2013.

Davis Wright Tremaine LLP
Attorneys for Plaintiff Trident Seafoods
Corporation


By s/Cindy L. Caditz_____
    Cindy L. Caditz, WSBA #16701


By s/Stuart R. Dunwoody_____
    Stuart R. Dunwoody, WSBA #13948

Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
Tel: 206-622-3150
Fax: 206-757-7700
Email: cindycaditz@dwt.com
Email: stuartdunwoody@dwt.com

COMPLAINT — 7
DWT 22902659v3 0064929-000376

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

# EXHIBIT A

Int. Cl.: 29

Prior U.S. Cl.: 46

Reg. No. 2,116,363

## United States Patent and Trademark Office

Registered Nov. 25, 1997

### TRADEMARK
### PRINCIPAL REGISTER

## TRIDENT

TRIDENT SEAFOODS CORPORATION (WASH-
INGTON CORPORATION)
5303 SHILSHOLE AVENUE NW
SEATTLE, WA 98107

FOR: PROCESSED SEAFOOD, IN CLASS 29
(U.S. CL. 46).

FIRST USE 9-0-1973; IN COMMERCE
9-0-1973.

SER. NO. 75-223,839, FILED 1-10-1997.

DARLENE BULLOCK, EXAMINING ATTOR-
NEY

Int. Cl.: 29

Prior U.S. Cl.: 46

**Reg. No. 2,116,397**

## United States Patent and Trademark Office

Registered Nov. 25, 1997

## TRADEMARK
### PRINCIPAL REGISTER



TRIDENT SEAFOODS CORPORATION (WASH-
INGTON CORPORATION)
5303 SHILSHOLE AVENUE NW
SEATTLE, WA 98107

FOR: PROCESSED SEAFOOD, IN CLASS 29
(U.S. CL. 46).

FIRST USE 8-0-1989; IN COMMERCE
8-0-1989.

SER. NO. 75-230,990, FILED 1-24-1997.

DARLENE BULLOCK, EXAMINING ATTOR-
NEY

Int. Cl.: 40

Prior U.S. Cls.: 100, 103 and 106

Reg. No. 2,367,693

**United States Patent and Trademark Office**   Registered July 18, 2000

### SERVICE MARK
### PRINCIPAL REGISTER



TRIDENT SEAFOODS CORPORATION (WASH-
INGTON CORPORATION)
5303 SHILSHOLE AVENUE NW
SEATTLE, WA 98107

FOR: PROCESSING OF SEAFOOD FOR OTHERS,
IN CLASS 40 (U.S. CLS. 100, 103 AND 106).

FIRST USE 8–0–1989; IN COMMERCE 8–0–1989.
OWNER OF U.S. REG. NOS. 2,116,363 AND
2,116,397.

SER. NO. 75–571,053, FILED 10–19–1998.

MATTHEW PAPPAS, EXAMINING ATTORNEY

Int. Cl.: 40

Prior U.S. Cls.: 100, 103 and 106

Reg. No. 2,367,702

## United States Patent and Trademark Office

Registered July 18, 2000

### SERVICE MARK
### PRINCIPAL REGISTER

## TRIDENT

TRIDENT SEAFOODS CORPORATION (WASH-
INGTON CORPORATION)
5303 SHILSHOLE AVENUE NW
SEATTLE, WA 98107

FOR: PROCESSING OF SEAFOOD FOR OTHERS,
IN CLASS 40 (U.S. CLS. 100, 103 AND 106).

FIRST USE 9-0-1973; IN COMMERCE 9-0-1973.
OWNER OF U.S. REG. NOS. 2,116,363 AND
2,116,397.

SER. NO. 75-572,872, FILED 10-19-1998.

MATTHEW PAPPAS, EXAMINING ATTORNEY

Int. Cl.: 29

Prior U.S. Cl.: 46

**United States Patent and Trademark Office**

Reg. No. 3,448,253

Registered June 17, 2008

## TRADEMARK
## PRINCIPAL REGISTER

### Trident Seafoods Naturals

TRIDENT SEAFOODS CORPORATION (WA-SHINGTON CORPORATION)
LEGAL DEPT
5303 SHILSHOLE AVE NW
SEATTLE, WA 98107

FOR: SEAFOOD; SURIMI, IN CLASS 29 (U.S. CL. 46).

FIRST USE 11-1-2007; IN COMMERCE 11-1-2007.

THE MARK CONSISTS OF STANDARD CHAR-ACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 2,116,363, 2,116,397, AND 2,367,693.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SEAFOODS NATURALS", APART FROM THE MARK AS SHOWN.

SER. NO. 77-255,677, FILED 8-15-2007.

LAURA HAMMEL, EXAMINING ATTORNEY

# United States of America

## United States Patent and Trademark Office

# TRIDENT SEAFOODS

**Reg. No. 4,346,995**

**Registered June 4, 2013**

**Int. Cls.: 5 and 29**

**TRADEMARK**

**PRINCIPAL REGISTER**

TRIDENT SEAFOODS CORPORATION (WASHINGTON CORPORATION)
5303 SHILSHOLE AVENUE N.W.
SEATTLE, WA 98107

FOR: DIETARY AND NUTRITIONAL SUPPLEMENTS FOR HUMANS AND FOR ANIMALS; FISH OILS FOR HUMAN CONSUMPTION FOR USE AS DIETARY SUPPLEMENTS; FISH OILS FOR ANIMAL CONSUMPTION FOR USE AS DIETARY SUPPLEMENTS, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

FIRST USE 8-0-2008; IN COMMERCE 8-0-2008.

FOR: SEAFOODS; EDIBLE OILS; EDIBLE FISH OILS; NUTRITIONAL OILS FOR FOOD PURPOSES; EDIBLE OILS AND EDIBLE FISH OILS FOR USE AS INGREDIENTS IN FOODS AND BEVERAGES, IN CLASS 29 (U.S. CL. 46).

FIRST USE 9-0-1973; IN COMMERCE 9-0-1973.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 2,116,363, 2,367,702, AND OTHERS.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SEAFOODS", APART FROM THE MARK AS SHOWN.

SN 77-700,309, FILED 3-26-2009.

JOHN KELLY, EXAMINING ATTORNEY

*Acting Director of the United States Patent and Trademark Office*

14

# United States of America
## United States Patent and Trademark Office



**Reg. No. 4,350,394**

**Registered June 11, 2013**

**Int. Cls.: 5 and 29**

**TRADEMARK**

**PRINCIPAL REGISTER**

TRIDENT SEAFOODS CORPORATION (WASHINGTON CORPORATION)
5303 SHILSHOLE AVENUE N.W.
SEATTLE, WA 98107

FOR: DIETARY AND NUTRITIONAL SUPPLEMENTS FOR HUMANS AND FOR ANIMALS; FISH OILS FOR HUMAN CONSUMPTION FOR USE AS DIETARY SUPPLEMENTS; FISH OILS FOR ANIMAL CONSUMPTION FOR USE AS DIETARY SUPPLEMENTS, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

FIRST USE 8-0-2008; IN COMMERCE 8-0-2008.

FOR: SEAFOODS; EDIBLE OILS; EDIBLE FISH OILS; NUTRITIONAL OILS FOR FOOD PURPOSES; EDIBLE OILS AND EDIBLE FISH OILS FOR USE AS INGREDIENTS IN FOODS AND BEVERAGES, IN CLASS 29 (U.S. CL. 46).

FIRST USE 8-0-1989; IN COMMERCE 8-0-1989.

OWNER OF U.S. REG. NOS. 2,116,363, 2,367,702, AND OTHERS.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SEAFOODS", APART FROM THE MARK AS SHOWN.

THE MARK CONSISTS OF THE WORDS "TRIDENT SEAFOODS" WITH THE DESIGN OF A TRIDENT STAFF AND WAVES.

SN 77-700,316, FILED 3-26-2009.

JOHN KELLY, EXAMINING ATTORNEY



Acting Director of the United States Patent and Trademark Office

# EXHIBIT B



Davis Wright
Tremaine LLP

Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045

Cindy Caditz
206.757.8097 tel
206.757.7097 fax

cindycaditz@dwt.com

September 25, 2013

**VIA FEDERAL EXPRESS**

Alexander Domnenkov
Triton Seafoods LLC
4602 148th Avenue NE
Redmond, WA 98052

Re:   Trademark and Trade Name Infringement by Triton Seafoods
      Our Reference: 64929-376

Dear Mr. Domnenkov:

We are writing to you as counsel for Trident Seafoods Corporation of Seattle, Washington ("Trident").  Trident is a well-known source of fresh seafood, processed seafood, and seafood products.  Since 1973, the trade name Trident Seafoods, and trademark TRIDENT, have been recognized by customers as an indication that the services provided in the seafood industry and the seafood bearing the name or mark originates from Trident.  Trident's exclusive right to use names and marks comprised of or including TRIDENT in association with services in the seafood industry and with seafood is partially evidenced by U.S. Trademark Registrations No. 2,116,363, No. 2,116,397, No. 2,367,693, and No. 2,367,702.  All of these registrations are valid, subsisting and incontestable.  Customers recognize and look for the trade name Trident Seafoods, and trademark TRIDENT as indications that the seafood services and seafood products identified by the mark originate from our client and that the services and products will have certain predictable and reliable quality and characteristics.  For these reasons the trade name Trident Seafoods, and trademark TRIDENT, represent and symbolize valuable goodwill owned by Trident.

We just became aware that you have created a company identified by the name Triton Seafoods LLC and that said company is using the name and mark TRITON SEAFOODS in connection with seafood marketing, processing, consulting, trading, export, import, brokering of seafood and bait sales.  According to your website, your services are marketed in channels of trade which directly overlap with Trident's trade channels, namely suppliers, processors, wholesalers, retailers, restaurants and consumers of seafood and seafood products.

Your continued use of the name and mark TRITON SEAFOODS is likely to cause, and no doubt has already caused, customers to believe that your goods and services originate from our client or are endorsed by, sponsored by, or in some way associated with Trident.  Trident has previously

Alexander Domnenkov
Triton Seafoods LLC
September 25, 2013
Page 2

obtained a Federal Court injunction to stop the use of TRITON by a competitor in the fishing industry and will do so again if necessary. See enclosed for your information and reference a copy of the prior order finding that TRITON is confusingly similar to TRIDENT and entering the injunction.

For the above-stated reasons, your use of the name and mark TRITON is likely to cause confusion, to cause mistake, or to deceive customers in violation of both federal and state law.

To prevent customer confusion and consequent damage to the goodwill associated with our client's trade name Trident Seafoods and trademark TRIDENT, we request that you take the following actions and agree to the following terms:

1. Refrain from any future use of any name or mark comprised of or including TRITON or TRIDENT in association with any goods or services directed or related to the seafood industry.

2. Change the name Triton Seafoods LLC to a name or mark that is not confusingly similar to Trident's name and trademark and terminate the use of the corporate name and trade name Triton Seafoods.

3. Either abandon the <tritonseafoods.com> domain name or transfer the domain name to Trident.

4. Refrain in the future from use or registration of any names or marks that include, or are substantially similar to the word TRIDENT.

Please provide us with your written confirmation by no later than **September 30, 2013**, that you will comply with our requests. After we receive your written response, we will memorialize terms of settlement in a more formal written agreement. We look forward to hearing from you.

Very truly yours,

Davis Wright Tremaine LLP

Cindy L. Caditz

Enclosure

DWT 22647346v1 0064929-000376

FILED

JUN 3 0 2000

UNITED STATES DISTRICT CC
DISTRICT OF ALASKA

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

RECEIVED

JUL 3 2000

Robertson, Monagle & Eastaugh
Anchorage

Trident Seafoods Corporation,      )
                                   )
                 Plaintiff,         )
                                   )        Case No. A00-180 CV (JWS)
        vs.                         )
                                   )
Triton Fisheries, LLC, et al,       )        ORDER FROM CHAMBERS
                                   )        (Motions at Dockets 2 and 10)
                 Defendants.        )
                                   )
_____)

## I. INTRODUCTION

This order concerns a motion for a temporary restraining order filed by Trident

Seafoods Corp. ("Trident") at docket 2. Trident sought issuance of a temporary

restraining order without notice, but the court declined to proceed on that basis.

Instead, an expedited briefing schedule was set and provision made for oral argument.[1]

Defendants Triton Fisheries, LLC, et al. ("Triton") oppose the motion. In its reply

memorandum at docket 10, Trident asks the court to strike various portions of affidavits

_____

[1] See Order, docket 4. One consequence is that the 10 day limitation on the
duration of temporary restraining orders issued without notice is inapplicable. See Fed.
R. Civ. P. 65(b).

1

*25*

filed by Triton.  Oral argument was heard on June 30, 2000.  Based on papers filed during oral argument it appears that the correct name for Triton is now King Triton, LLC.  References in this order to Triton include the entity named King Triton, LLC.[2]

## II. BACKGROUND

### A.    Claims and Jurisdiction

This is essentially a trademark dispute to which Trident has appended several state law claims arising from the same facts.  The court may adjudicate the claims based on its jurisdiction over questions of federal law, its jurisdiction over trademark claims, and its supplemental jurisdiction over state law claims.[3]

There is a related lawsuit styled *King Triton Fisheries, LLC vs. Trident Seafoods Corporation*, Case No. A00-177 CV.  There, Triton seeks a declaratory judgment respecting the trademark issues and advances a claim based upon Trident's alleged violation of the Sherman Act.  The court has considered the materials on file in that lawsuit as well as those filed in the instant dispute.[4]

### B.    Parties

Trident is a Washington state corporation that does business in Alaska.  Triton is

---

[2]Triton filed a motion to correct case caption during oral argument.  The court has not had time to address that motion, but it likely will be granted.

[3]*See* 28 U.S.C. § 1331 (federal question), § 1338 (trademark), § 1367 (supplemental).

[4]There is a pending motion to consolidate the two actions which is not yet ripe.  Unless specifically designated by reference to Case No. A00-177 CV (JWS), all references in this order to docket numbers are references to docket numbers in Case No. A00-180 CV (JWS).

2

a limited liability company organized under the laws of Alaska. According to Triton, it changed its name to King Triton Fisheries, LLC after reviewing a June 2, 2000 cease and desist letter from Trident.[5] Defendant Chris Fischer and his brothers Mathew and Michael own Triton. As discussed below in greater detail, Trident and Triton are both engaged in the purchase, processing and marketing of fish harvested in Alaska

C.   **Dispute**

In Greek mythology, Triton was the son of Poseidon, the God of the Sea.[6] A trident is a three-pronged spear used in classical times by fishermen. Poseidon was customarily depicted wielding a trident.[7]   There are over 60 entities which use the mark "trident" in their name, and more than 80 entities use the mark "triton."[8]

Trident purchases, processes, and markets seafood. Much of its activity involves red salmon harvested in Bristol Bay. Trident has made commercial use of the name Trident since 1973. Trident has operated canneries, floating processors, and support barges in the Bristol Bay region for more than 21 years. Trident enjoys a

_____

[5] *See* Complaint, docket 1, ¶18, Case No. A00-177 CV (JWS).

[6] *See* Funk & Wagnalls Standard Dictionary of Folklore, Mythology, and Legend at 1126 (1950)("*Funk & Wagnalls*"). *Funk & Wagnalls'* entry states, in part:

> In Greek mythology, [Triton was] a monstrous son of
> Poseidon and Amphitrite, human from the waist up, fish from
> the waist down. Triton blew a twisted seashell to raise or
> calm the storm.

*Id.*

[7] *See Funk & Wagnalls, supra,* at 881.

[8] *See* docket 8, exhs. E and F.

3

worldwide market for its seafood products and sells them under the trade name "Trident Seafoods." A symbol of a trident above a wave with the name "Trident" has been used by Trident as a label on its products for over 10 years. In 1997, Trident applied for and received federally-registered trademarks to protect the mark "Trident" and "Trident and design" in association with processed seafood.[9]

Triton was formed in February 2000 as a successor corporation to Dragnet Fisheries, Inc. Like Trident, Triton purchases, processes and markets red salmon--also known as sockeye salmon--harvested in Bristol Bay. Triton and Trident both operate processing facilities in the Bristol Bay region. Triton also operates a fish processing plant in Kenai, Alaska. Both Trident and Triton (via a broker) sell their fish into the Japanese market which is the principal market for Bristol Bay red salmon and for Alaskan salmon roe. Triton has an agreement to sell its fish and roe through Double E Foods, LLC ("Double E") located in Seattle, Washington. Double E is a purchaser and commission broker of seafood. Trident does not sell fish through Double E.[10]

Double E has agreed to purchase and broker all of Triton's production from both

---

[9]The facts in this paragraph are taken from the several unnumbered affidavits and associated exhibits attached to docket 2 and from the fact stated in the verified complaint and exhibits thereto at docket 1. The exhibits attached to the motion should have been numbered pursuant to D. Ak. LR 5.1(c) which this court interprets to apply to motions as well as to papers that are technically "pleadings." Trident did number the exhibits attached to the verified complaint in compliance with the local rule.

[10]The facts in this paragraph are generally taken from the several affidavits and associated exhibits attached to docket 8. Triton did label each of its exhibits, but failed to number the pages as required by D. Ak. LR 5.1(c). The court has taken judicial notice that Japan is the principal market for Bristol Bay red salmon and for Alaskan salmon roe. Trident concedes in its briefing that it does not sell product to Double E.

its Bristol Bay facility located in Dillingham and its Kenai processing plant. All Triton's

red salmon production will be received by Double E in frozen form and kept in cold

storage pending shipment to customers in Japan and possibly one customer in

Canada. Other species of salmon will be sold to domestic re-processors. Roe will be

sold exclusively to Japanese customers.[11] Triton spent approximately $250,000 to

purchase shipping boxes and have them imprinted with its name in Seattle. Triton

incurred transportation costs estimated to be about $160,000 to bring the imprinted

boxes to Alaska. Without use of these boxes, Triton contends that it will be unable to

do business.[12]

     Trident and Triton will compete in the Bristol Bay sockeye salmon fishery. The

sockeye season is short—typically lasting from June 25 through mid to late July with

peak harvests around July 4. Heavily regulated by the State of Alaska, the fishery is

characterized by periodic "openers"--periods of 6 to 18 hours of frenetic activity in

which fishing is allowed. Fish processors such as Trident and Triton compete for

delivery of red salmon from fishing vessels and fish tenders. Fish processors also

compete for employment of support personnel. Communications are primarily

conducted by way of VHF radio and other mobile communication equipment. Some of

those working in the Bristol Bay sockeye fishery speak English only as a second

---

[11] *See* docket 8, exh. G.

[12] *See* docket 8, exh. B.

5

language.[13]

After basic processing and packaging, red salmon and salmon roe marketed by Trident and Triton is shipped to Japan where it is received in public cold storage facilities together with salmon products from other sources.  It is not unusual for frozen salmon products to remain in their shipping boxes for a year or more at the public facilities.  Salmon products are purchased by wholesalers who draw it from storage for sale to re-processors and others.  Workers in the cold storage facility generally speak Japanese, not English.  Products are often sold at auction where the name is one of the criteria used by the auctioneer to identify lots being sold.  Triton and Trident translate into very similar characters in the Japanese language.[14]

On or about May 30, 2000, Trident first became aware of Triton when it received a copy of a letter from Triton addressed to all Bristol Bay fishing permit holders.  The letterhead logo depicted a king holding a trident adjacent to the name "Triton."[15]  On June 2, 2000, counsel for Trident, Robert Nelson, wrote Triton and asked it to cease and desist from using the name Triton.  Nelson explained that Trident held federally-registered trademarks protecting the name "Trident" and that it had "consistently and

---

[13]The facts in this paragraph are taken from Trident's exhibits and verified complaint.

[14]Affidavit of Katsuya Sumida, which was supposed to have been an exhibit to docket 11, but was omitted.  A copy was served on Triton's counsel.  A copy was given to the court during oral argument.  To be certain that a copy is properly of record, Trident shall file another copy of Mr. Sumida's affidavit.

[15]See docket 1, exh. 6.

6

continuously" used its trademarks since 1973 "in association with its harvesting, processing, sale and distribution of seafood products."[16] Nelson advised Fischer that Triton's use of its name in the same industry would likely cause confusion in the marketplace.[17] Chris Fischer contacted Trident's president to discuss the situation, but the parties were unable to resolve their differences. On or about June 14, 2000, Triton decided to change its name to "King Triton Fisheries." Triton stamped "King" before "Triton" on its shipping boxes. Triton advised Trident of its name change, but Trident was unsatisfied. Nelson wrote a second letter to Triton on June 14, 2000 explaining why Trident did not think that the name change was sufficient to eliminate its trademark concerns.[18] Nelson noted that the names were phonetically similar, and that given the tendency of advertisers and consumers to shorten names, no real protection would be afforded Trident simply by adding a "King" before "Triton."[19] Nelson told Fischer that Trident appreciated the fact that Triton had invested approximately $250,000 in shipping boxes bearing its name. Nelson advised that Trident had no objection to Triton using labels to cover up its name on the shipping boxes it had purchased even though Trident recognized that some labels might come off in cold storage and that the

---

[16]See June 2, 2000 letter from Robert D. Nelson to Chris Fischer, docket 1, exh. 1 in Case Number A00-177 CV (JWS).

[17]Id.

[18]See June 14, 2000 letter from Robert D. Nelson to Chris Fischer, docket 1, exh. 1 in Case Number A00-177 CV(JWS).

[19]Id.

7

name "Triton" might still be visible beneath labels in other instances.  Triton rejected this offer.

### D.   Procedural History

On June 16, 2000, Triton filed a complaint for declaratory relief in Case Number A00-177 CV (JWS) seeking a declaratory judgment that its use of the word "Triton" does not infringe upon Trident's federally-registered trademark, and that "King Triton Fisheries" is not confusingly similar to "Trident Seafood" and advancing an anti-trust claim against Trident.  Trident filed the case at bar on June 21, 2000 alleging claims for trademark infringement, false designation of origin/unfair competition, dilution of trademark, unfair competition under state law, intentional interference with prospective economic advantage, and related common law claims.  In the pending motion, Trident seeks a temporary restraining order prohibiting Triton from using the name "Triton" or symbols associated with that name which are confusingly similar to "Trident."

### III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 authorizes injunctive relief under certain specified conditions.  "Preliminary injunctive relief is appropriate when a plaintiff establishes (1) probable success on the merits and irreparable harm if relief is denied, or (2) that there are serious questions on the merits and the balance of hardship tips sharply in favor of plaintiff."[20]  The test represents "a single continuum of concern which

---

[20]*Rowe v. Burton*, 884 F. Supp. 1372, 1375 (D. Alaska 1994) (*citing Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 602 (9th Cir. 1991)).

8

evaluates two factors that must always be considered: 'The likelihood of the plaintiff's success on the merits; and the relative balance of potential hardships to the plaintiff, defendant, and public.'[21]   Analysis is affected by the relative probability of success and potential hardship: "[t]he higher a plaintiff's probability of success, the less the balance of hardship need tip in plaintiff's favor to support issuance of an injunction."[22]

## IV. DISCUSSION

Trident argues that it is entitled to preliminary injunctive relief with respect to its claims for trademark infringement, trademark dilution, and intentional interference with prospective economic advantage.  The following discussion first analyzes the merits of each claim to determine whether Trident has established a likelihood of success with regard to each claim.  After examining the merits of each claim, the order examines the balance of hardships to determine whether injunctive relief would be appropriate.

### A.   Trademark Infringement Claim

To succeed on its trademark infringement claim, Trident will have to establish that it possesses valid marks and that there is a likelihood of confusion in the relevant marketplace.  Likelihood of confusion addresses whether marks are so similar that they are likely to confuse customers about a product's source.  The Ninth Circuit analyzes likelihood of confusion using a multi-factor test:

[S]imilarity of the conflicting designations; relatedness of

---

[21]*Id.* (quoting *State of Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1389 (9th Cir. 1988)).

[22]*Id.*

9

proximity of the two companies' products or services;
strength of [Trident's] mark; marketing channels used;
degree of care likely to be exercised by purchasers in
selecting goods; [Triton's] intent in selecting its mark;
evidence of actual confusion; and likelihood of expansion in
product lines.[23]

1.    Similarity of Conflicting Designations

Trident argues that Triton's mark is substantially similar to Trident's marks in

appearance, sound, and meaning.  The court agrees.  The phonetic similarity is

striking.  Both "trident" and "triton" begin with the same first syllable, use a two syllable

structure, and place the emphasis on the first syllable.  In each case the second

syllable begins with a "d" or "t", letters whose sounds are very similar and which are

phonetically and linguistically related.[24]   The major market for Bristol Bay red salmon

is Japan, where English is not the primary language.  The symbolic or associational

similarity is also quite close.  As previously noted, in Greek mythology Triton was the

---

[23]See Brookfield Communications v. West Coast, 174 F.3d 1036, 1053-54 (9th
Cir. 1999).  These factors are based on the leading Ninth Circuit case, AMF, Inc. v.
Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979).  Two points should be noted.
First, the Ninth Circuit has applied different versions of the Sleekcraft test over the
years, and the relevant test has been variously expressed as a five, six, or eight factor
test.  See Eclipse Associates Ltd. v. Data General Corp., 894 F.2d 1114, 1117-18 &
1117 nn. 2-4 (9th Cir. 1990) (for citation to authority with discussion).  Second,
regardless of which test has been applied, the Sleekcraft factors are guidelines, and
not absolute requirements.  Id.

[24]Phonetically, both "d" and "t" are classified as alveolar stops.  See, e.g., Kevin
Russell, Course Outline on Linguistics, University of Manitoba reproduced at
http://www.umanitoba.ca/linguistics/russell/138/jan24/chart.htm (consonant chart with
discussion).  Linguistically, both "d" and "t" are classified as dental preterites used as
suffixes with the Germanic weak verb form.  See William H. Torrence, "Getting a Bite
on the Germanic Dental Preterit," 3 Mathelienda (spring 1996), reproduced at
http://virtual.park.uga.edu/~mathelie/mathiii3.html (for discussion).

10

son of Poseidon, the God of the Sea, who was usually depicted holding a trident. Triton's letterhead depicts a king holding a trident. Both Trident and Triton use the trident spear as symbols. Triton offers the affidavits of Randy S. Patrick of Double E and a Bristol Bay fisherman named Sidney C. Litchfield who opine that they do not find the names confusing.[25] However, the opinions expressed in these affidavits provided by persons doing business with Triton are far less persuasive than the accounts of what is actually happening in the field offered in the affidavit of Orin D. Seybert, president of Peninsula Airways, Inc., reporting on confusion already encountered in the nascent fishing season by his airline's personnel and the affidavit of Trident's Charles H. Bondurant reporting on the mistakes that various vendors have already made by confusing Trident and Triton.[26] Finally, it may be noted that the names are so similar that the very drafting and editing this order has been slowed by a tendency to confuse the names.

Triton's best argument against confusion based on similarity is that the graphic depictions used by Trident and Triton do look different. However, those who deal in products must talk about them and the similarity is such that in verbal communication confusion is certain to occur.

Triton contends that there is no longer any likelihood of confusion because it has

_____

[25]*See* docket 8, exhs. G and L.

[26]Docket 2, unnumbered exhibits. Counsel for Trident is directed to read and in the future to comply with D. Ak. LR 5.1(c) which this court interprets to apply to motion papers as well as documents which fall within the technical definition of pleadings.

11

changed—or is in the process of changing—its name from Triton to "King Triton," and intends to replace the trident with a spear.[27]  There are at least two reasons why addition of the qualifier "King" before "Triton" might not cure the infringement.  First, as Trident persuasively argues, in today's world there is a pervasive tendency to shorten names in everyday usage.  Thus, although "King Triton" seems dissimilar from "Trident," common experience suggests that in everyday usage the "King" will be dropped in favor of the simpler and direct "Triton."  McCarthy indicates that "[t]he common propensity to abbreviate terms can contribute to a finding of likely confusion when parties drop qualifying words, leaving only the confusingly similar root terms."[28]  Second, there is considerable authority for the proposition that an additional word or modified prefix or suffix may not cure the problem.  McCarthy reviews several examples where a likelihood of confusion was found to exist although the marks included different prefixes, a different word or an additional word.[29]  Examples include, among others: (1) "Dramamine" and "Bonamine;" (2) "Caesars Palace" and "Trump's Palace;" (3) "Clinique" and "Basique;" and (4) "Chic" and "L.A. Chic."[30]  These are merely a few, representative examples where trademark infringement was established even though there was some dissimilarity between the senior and junior marks.

---

[27] *See* Triton's Opposition, docket 8 at pp. 3-5, 8, 10, and 12.

[28] *See McCarthy, supra,* § 23:50 at 23-110.

[29] *See McCarthy, supra,* § 23:56 at 23-124 through 23-127.

[30] *Id.* (citing authorities).

12

In sum, Triton's recent attempt to cure the problems associated with its mark by adding a "King" before "Triton" appears insufficient to cure the infringing nature of "Triton." There is a strong likelihood of confusion between the marks "Trident" and "Triton." or "Trident" and "King Triton."

2.     **Relatedness of Proximity of Products and Services**

Trident and Triton are competitors in the fish processing industry purchasing and processing red salmon in the same region and selling into the same market. Related goods and services have a greater tendency to confuse the public especially when the two companies are competitors.[31] Trident and Triton are engaging in very similar operations in the same region. Trident and Triton are competing for fish from the same pool of fishermen and fish tenders. Trident and Triton are competing for support personnel in the same region. Trident and Triton use the same services and suppliers. Most significantly, Trident and Triton sell essentially identical products (their red salmon and salmon roe) into the same market in Japan.

3.     **Strength of Trident's Marks**

Trident's marks are federally-registered. A trade name protects the name of a business or organization and basically, although not exclusively, represents the value of its goodwill.[32] A trademark protects goods or services and generally reflects a

---

[31] See Brookfield, supra, 174 F.3d at 1055-56.

[32] See, e.g., Self-Realization Fellowship Church v. Ananda Church of Self-realization, 59 F.3d 902, 908 (9th Cir. 1995) (generally noting distinction between trade names and trademarks).

13

measure of quality, authenticity, or other desirable attributes.[33]  There are four broad

categories of marks:[34]  (1) fanciful[35] or arbitrary;[36] (2) suggestive;[37] (3) descriptive;[38] and

(4) generic.[39]  Fanciful, arbitrary, and suggestive marks are inherently distinctive and

entitled to the greatest trademark protection.[40]  Descriptive marks are only entitled to

protection if they acquire secondary meaning.[41]  Generic names are never afforded

---

[33]*Id.*

[34]*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 718 F.2d 327, 329 (9th Cir. 1984), *reversed on other grounds*, 469 U.S. 189, 105 S. Ct. 658 (1985);  *see also* Michael A. Epstein, *Modern Intellectual Property*, § 7.02[B] at 7-12 (1995) ("*Epstein*").

[35]A fanciful mark is a coined word or phrase without lexical precedent.  *Epstein*, § 7.02 [B][1] at 7-12   Examples include "Clorox" (bleach), "Kodak" (film), and "Xerox" (copier).  *McCarthy, supra,* § 11:8 at 11-13 - 11-14.

[36]An arbitrary mark is a word or phrase in common usage or with common understanding, but which has no relationship to the product, service, or business it represents.  *Epstein,* § 7.02[B][1] at 7-12 - 7-13.  Examples include "Mustang" motel, "Stork Club" night club, "Shell" gasoline, and "Apple" computers.  *McCarthy,* § 11:8 at 11-13 - 11-14.

[37] A suggestive mark requires some imagination to link the product or service with the mark.  *Epstein,* § 7.02[B][1] at 7-12.  "Greyhound" bus lines is an example.  Suggestive marks "are sometimes difficult to distinguish from arbitrary marks."  *McCarthy,* § 11:12 at 11-16. However, because both are entitled to trademark protection under the same legal analysis and do not require proof of secondary meaning, McCarthy observes that "for legal purposes, there is little, if any, reason to make the distinction." *Id.*

[38]A descriptive mark describes a product or its intended purpose, function, or effect.  *McCarthy,* § 11:16 at 11-19 - 11-20.

[39]A generic name describes what a product is.  *McCarthy,* § 12:1 at 12-3

[40]*Official Airline Guides v. Goss*, 6 F.3d 1385, 1390 (9th Cir. 1993).

[41]*Id.*

14

trademark protection.   Trident's marks are inherently distinctive whether one considers them to be arbitrary, fanciful, or suggestive.  Trident has consistently and continuously used the marks for many years.[42]  This factor supports finding that likelihood of confusion exists.

4.   Marketing Channels Used

When both companies use the same marketing channels, the likelihood of confusion is increased.[43]   Most, perhaps all, of the red salmon product from Trident and Triton will eventually be sold to Japanese wholesalers.  They appear to use different brokers, but the processors' ultimate success obviously depends on developing and maintaining a satisfied customer base in Japan.  Although Double E's Mr. Patrick professes that the similarity of names is not confusing, the court finds Mr. Sumida's affidavit far more persuasive.

5.   Degree of Care Likely to be Exercised by Purchasers

The test used to evaluate likelihood of confusion among relevant customers is the typical buyer exercising ordinary care.[44]  Both Trident and Triton sound phonetically similar and both use a trident or spear.  The typical buyer, especially buyers located abroad who must communicate across a language barrier, would likely confuse the

---

[42]It has used the name Trident for nearly 27 years and the name and design for approximately 11 years.  See Docket 2, Exhibit A (Case Number A00-180 CV (JWS)).

[43]See Sleekcraft, supra, 599 F.2d at 353; Brookfield, supra, 174 F.3d at 1056

[44]See Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 156 (9th Cir. 1963).

marks when using ordinary care.  Trident and Triton translate into very similar

characters in Japanese.  While Triton argues that the court should be mindful of the

cases which address situations where the customers are sophisticated, these cases do

not capture the dynamic which affects the marketing of red salmon in Japan as

explained in Mr. Sumida's affidavit.  It may be that the Japanese traders are very

sophisticated in a general sense, but the distribution of red salmon and salmon roe

products in Japan does depend upon the ability of many people including

warehousemen and auctioneers and buyers operating under time pressure to correctly

identify products.

6.    **Triton's Intent in Selecting Its Mark**

Intent is not an essential factor but may be considered.[45]  Trident makes a

colorable case that Triton selected its mark to ride on Trident's commercial coattails.

Trident is an experienced fish processor that enjoys a favorable reputation and

worldwide market.  Intent may sometimes be inferred from adoption of a mark that is

substantially similar to a senior user's mark.[46]  Intent may also be inferred by a junior

user's continued use of a mark after receipt of a cease and desist letter from the senior

user.[47]  Although the court has no reason to doubt that Mathew Fischer first thought of

the name Triton Fisheries while working on a college thesis before he knew of Trident

---

[45]See *McCarthy*, § 23:106 at 23-205; see also *Brookfield*, supra, 174 F.3d at
1059.

[46]See *McCarthy*, supra, § 23:119 at 23-225.

[47]See *McCarthy*, supra. § 23:120 at 23-226..

16

character in the movie *The Little Mermaid*,[48] it strains credulity to accept the proposition that Triton actually embarked on such a large commercial venture without being aware of Trident's marks, given Triton's long participation and dominant position in the relevant marketplace. Any reasonably prudent business person would know who are the significant players in the economic market which the business person intends to enter. In short, it is probable—although, of course, the court is not now holding—that Trident will establish Triton intended to cash in on Trident's name.

7.   Evidence of Actual Confusion

Actual confusion need not be established to support a finding of likelihood of confusion.[49] Indeed, actual confusion in the product market cannot be proved in this case because the product has not yet reached Japan. Trident does submit evidence of actual confusion in the fishing and support activities as described in the affidavits of Orin D. Seybert, president of Peninsula Airways which does business as PenAir, and Charles H. Bundrant, Trident's president.[50] Seybert indicates that as of June 16, 2000, before the Bristol Bay fishing season was fairly under way, PenAir personnel had already delivered freight meant for Triton to Trident on at least three occasions and attempted to obtain a purchase order from Trident to transport one of Triton's fishermen. In pertinent part, Bundrant states:

_____

[48]*See* docket 8, exhs. A and B.

[49]*See McCarthy, supra*, §23:12 at 23-37; *see also Sleekcraft, supra*, 599 F.2d at 352.

[50]Docket 2, unnumbered exhibits.

17

In fact, substantial actual confusion has already occurred and is ongoing. For example, meals have been charged against Trident's account on a "P.O." apparently by Triton fishermen at a restaurant in Dillingham; Triton freight and mail are being delivered to Trident; fishing vessel support services in connection with a Trident fisherman's vessel have been confused with services apparently being offered to Triton fishermen in South Naknek; numerous directory assistance calls at Dillingham in the Nushagak District are resulting in Trident's telephone number being given to persons seeking Triton's telephone number several times per day; fuel, supplies and other suppliers and local air travel and freight providers are confusing Trident and Triton in their invoices and billing Trident for services apparently rendered to Triton.[51]

Bundrant opines that continued confusion is likely to persist, and that Trident's

reputation among fishermen and purchasers in the relevant market will likely suffer as a

result.[52]   Of course, the confusion disclosed in the Seybert and Bondrant affidavits is

confusion among fishermen and suppliers, not customers.  However, the extent and

immediacy of their confusion illustrates how likely it is that customers will also be

confused.  The affidavits from Mssrs. Patrick and Litchfield express the notion that

neither of them has been personally confused, but such statements do not adequately

rebut the events reported in the affidavits of Mssrs. Seybert, Bundrant, and Sumida.

This factor therefore supports a  finding that likelihood of confusion exists.

    8.   <u>Likelihood of Expansion in Product Lines</u>

Likelihood of expansion in product lines may support a finding of confusion

---

[51] See Affidavit of Charles H. Bundrant, June 20, 2000, ¶ 9 at p. 4 (submitted at docket 3).

[52] Id., ¶ 10 at p. 4.

where an infringing party may expand its business operations to compete with the senior user of the mark.[53] If goods or services are closely related, any expansion may create direct competition. This factor does not appear especially significant here, because Trident and Triton are already direct competitors in the Japanese market with respect to the sale of this season's harvest of red salmon. However, it may be noted that both Trident's operations and Triton's involve seafood from other geographic areas and products other than red salmon into which the other may expand and then compete for customers. The potential competition in other markets is a consideration which supports a conclusion that a likelihood of confusion exists.

9.   Summary (re: Trademark Infringement Claim)

Trident has established that it has valid marks which are federally-registered. Based on application of the *Sleekcraft* factors, Trident has established that there is a likelihood of confusion among its customers caused by Triton's use of its allegedly infringing name and logo. Trident has therefore established that it has a likelihood of success on the merits concerning its trademark infringement claim. Of course, additional evidence, briefing, and argument may lead to a different conclusion if this litigation proceeds to a final determination on the merits. Whether the balance of hardships supports injunctive relief will be explored below after briefly examining the merits of Trident's other claims.

---

[53] *See Sleekcraft, supra*, 599 F.2d at 354.

19

### B.   Trademark Dilution Claim

Dilution protects well-recognized marks in the absence of trademark infringement.[54]  Dilution assumes that there is no likelihood of confusion.  Instead, the harm to the protected mark occurs by blurring or tarnishment.[55]  Blurring occurs when a mark loses its distinct significance and becomes weakened even though there is no confusion as to the source or affiliation of the mark causing the dilution.[56]  McCarthy cites as an example a restaurant named "Tiffany" in Boston which has the potential to weaken the distinctive significance of Tiffany jewelers in New York City.[57]  Tarnishment occurs when the senior mark's value is degraded or devalued or suffers other negative associations because of the junior mark's use.[58]  McCarthy cites as an example posters stating "Enjoy Cocaine" and employing colors and script similar to advertisements for Coca Cola.[59]

To prevail on its trademark dilution claim, Trident will have to establish that:  (1) Trident's mark is distinctive and famous;  (2) Triton is making a commercial use of Trident's trademark;  (3) Triton began using its mark after Trident's marks became

---

[54]See, e.g., McCarthy, supra, § 24:70 at 24-121 (for general discussion).

[55]See Restatement (Third) of Unfair Competition, § 25 at 265-84 (1995).

[56]See McCarthy, § 24:68 at 24-120.

[57]Id.

[58]See McCarthy, § 24:104 at 24-202 through 24-203.

[59]Id. at 24-203.

20

famous; and (4) Triton's use of the same or similar mark dilutes the mark's quality "by diminishing the capacity of the mark to identify and distinguish goods and services."[60]

The Lanham Act lists eight non-exclusive factors for courts to use in determining whether or not a mark is distinctive and famous:

> (A) the degree of inherent or acquired distinctiveness;
>
> (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
>
> (C) the duration and extent of advertising and publicity of the mark;
>
> (D) the geographical extent of the trading area in which the mark is used;
>
> (E) the channels of trade for the goods or services with which the mark is used;
>
> (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;
>
> (G) the nature and extent of use of the same or similar marks by third parties; and
>
> (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.[61]

It seems clear that a mark is not distinctive and famous just because it is protected or federally-registered. Instead, something more is required. McCarthy explains:

> Both the legislative history of the original 1988 bill and the

---

[60] See Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1324 (9th Cir. 1998).

[61] See 15 U.S.C. § 1125(c)(1)(A)-(H).

21

1996 Act indicate that Congress intended that the courts should be discriminating and selective in categorizing a mark as "famous" so as to qualify for protection against dilution. The Trademark Review Commission referred to the dilution remedy as an "extraordinary" one that required a significant showing of fame. The Restatement opines that a mark must be strong enough that its trademark significance is apparent even when the mark is encountered outside of its own market segment.[62]

Thus, the question is not whether Trident has consistently used its mark for many years to distinguish its seafood products. It has. Instead, the question is whether Trident's mark is "strong enough that its trademark significance is apparent even when the mark is encountered outside of its own market segment."[63] The Restatement offers the following comment:

> Not all trademarks warrant protection against a dilution of the mark's distinctiveness. In applying the antidilution statutes, most courts require that the mark possess a degree of distinctiveness beyond that needed for the designation to qualify as a valid trademark. As a general matter, a trademark is sufficiently distinctive to be diluted by a nonconforming use if the mark retains its source significance when encountered outside the context of the goods or services with which the mark is used by the trademark owner. For example, the trademark KODAK evokes an association with the cameras sold under that mark whether the word is displayed with cameras or simply appears alone. On the other hand, the designation ALPHA could become sufficiently distinctive to be protectable as a trademark for cameras, but a use of the term by itself might still evoke a variety of different associations, including nothing more than the first letter of the Greek alphabet. A mark that evokes an association with a specific source only

---

[62] See McCarthy, § 24:92 at 24-157 through 24-158.

[63] Id. at 24-158.

22

> when used in connection with the particular goods or
> services that it identifies is ordinarily not sufficiently
> distinctive to be protected against dilution.[64]

Here, the mark "Trident" evokes a number of different associations when not used in connection with the particular products offered by Trident Seafoods Corporation—"Trident" chewing gum comes to mind. As previously discussed, there are approximately 60 companies that use the mark "trident" in their corporate name.[65] Consequently, Trident's marks are closer to the "Alpha" example discussed by the Restatement than to the "Kodak" example. Trident's marks are not entitled to classification as "distinctive and famous" marks for purpose of trademark dilution. It may be that additional evidence, briefing, and argument will compel a different conclusion. However, on the present record, Trident has not established that its marks are distinctive and famous.

In light of the above conclusion, it is not necessary to examine any of the remaining factors. It follows that Trident is not entitled to preliminary injunctive relief based on its trademark dilution claim.

C.   Intentional Interference with Prospective Economic Advantage

Trident also seeks preliminary injunctive relief regarding its intentional interference with prospective economic advantage claim.[66] However, Trident has not

---

[64]See Restatement (Third) Unfair Competition, § 25 cmt. e, at 266–69 (1995) (emphasis added).

[65]See Complaint, docket 1, ¶ 20 in Case Number A00-177 CV (JWS).

[66]See Trident's motion, docket 3 at 18-19.

23

adequately briefed this argument.  Trident cites no case law or other authority

supporting injunctive relief concerning its intentional interference with economic

advantage claim.   Trident does not discuss the elements of the claim which it will have

to establish in order to prevail.[67]  D. Ak. LR 7.1(d) provides, in pertinent part, that

"[f]ailure to include proper materials in support of . . . a motion shall subject motions to

summary ruling by the court *sua sponte*.  If the failure is by the movant, it may be

deemed an admission that the motion is without merit . . . ."[68]

Trident has failed to adequately support its argument that it is entitled to

preliminary injunctive relief based on its claim for interference with prospective

economic advantage.  On the existing record, this claim does not warrant injunctive

relief.

---

[67]Under Alaska law, the tort of intentional interference with prospective economic
advantage is composed of six elements which the plaintiff must prove: (1) that a
prospective business relationship existed; (2) the defendant knew of the prospective
business relationship and intended to prevent it from taking place; (3) the prospective
business relationship did not result in pecuniary benefit to the plaintiff; (4) the
defendant's conduct interfered with the prospective relationship; (5) the interference
caused damages; and (6) the defendant's conduct was not privileged or justified.  *See
Odom v. Fairbanks Mem. Hospital*, 999 P.2d 123, 132 (Alaska 2000).  The Restatement
does not recognize formal privileges excusing one's interference, but justifications
exist, including the right of competitors to interfere with economic relations under
certain circumstances.  *See* Restatement (Second) of Torts, § 768 at 39-44 (1979) (for
statement of basic rule with commentary and examples).  Here, Trident has done
nothing to address damages which appear negligible if indeed non-existent.
Furthermore, Triton's status as a competitor may shield it from liability.  The court
makes these observations <u>not</u> to express any views as to the ultimate merits, but simply
to explain why it appears that preliminary injunctive relief at this stage of the litigation is
not appropriate with respect to Trident's claim for intentional interference with
prospective economic advantage

[68]*See* D. Ak. LR 7.1(d).

24

D.     Relative Hardship (Balancing the Hardships)

Trident has invested substantial time and resources in its federally-registered marks. The marks reflect quality, goodwill, and other positive attributes which trademark law is designed to protect. Trident's reputation and goodwill earned after many years in the fishing industry are placed at risk by Triton's activities. The potential damage to Trident's reputation and goodwill is difficult to measure in terms of money damages. The burden upon Triton should an injunction issue, in contrast, is relatively small. Compared to Trident, Triton has invested little time or money in its infringing name. Triton may bring itself into compliance with trademark law by selecting another name for use this fishing season and by using ink, paint, tape or labels to cover up the offending name on its boxes and other materials. The court does recognize that a brief period of time will be needed for Triton to effect an appropriate name change, but that is easily addressed in the injunction. It should be noted that affording Triton time to make the name change will protect the interests of Triton's fishermen who might be harmed if Triton had to shut down briefly in order to make the name change. Under all of these circumstances, the relative hardships favor Trident.

E.     Security

Federal Rule of Civil Procedure 65(c) states, in part, that "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined

25

or restrained."[69]  Ordinarily, the court "will fix security in an amount that covers the
potential incidental and consequential costs as well as either the losses the unjustly
enriched or restrained party will suffer during the period he is prohibited form engaging
in certain activities . . . ."[70]  Here, neither party has carefully addressed what security
should be imposed as a condition for an injunction.  Triton has already made
arrangements to broker its entire production of fish and roe through Double E.  There is
no suggestion that Double E will back out of its agreement merely because Triton
begins to use another name.  Similarly, there is nothing to show that any of the
fishermen or employees who have been secured for the 2000 season will "jump ship"
merely because the vessel is reflagged, so to speak.  The only real damage Triton
discusses is the fact that it paid about $250,000 for imprinted shipping boxes and an
estimated $160,000 to transport the boxes to Alaska.  But these costs do not translate
directly into harm which would result if Triton must use another name.  Triton may still
use the boxes if it substantially obscures the infringing imprint.  It might do so by rolling
ink or paint over the imprint, or by covering it with tape or labels.  Thus, Triton will incur
the cost of ink, paint, tape or labels plus the cost of labor to apply the same.  Triton may
incur other incidental costs to change letterhead, phone listings, bank account names,
etc. and to notify fishermen and  the public of a name change, but Triton has not
addressed such costs in its briefing.  Considering all the circumstances, the court

---

[69]*See* Fed. R. Civ. P. 65(c).

[70]*See* 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane. *Federal Practice and Procedure*, § 2954 at 292 (2d ed. 1995) ("*Wright*").

26

SENT BY:Xerox Telecopier 7021 ; 7- 5-00 ; 8:31AM ;                    2782234→        12067817863;#26

concludes that a deposit into the registry of the court in the amount of $40,000 is appropriate security.[71]

## V. CONCLUSION

For the preceding reasons, Trident's motion for a temporary restraining order at docket 2 is GRANTED with respect to its trademark infringement claim only on condition that Trident tender the sum of $40,000 for deposit in the registry of the court not later than 4:00 PM, on June 30, 2000.   The deposit may be tendered in the form of a check.

Upon timely tender of the $40,000 security by Trident, and effective at 12:01 AM on July 4, 2000, Triton Fisheries, LLC, a/k/a King Triton Fisheries, LLC, and its officers, agents, and employees are ENJOINED from using the words "Triton" and "King Triton" and the trident symbol in any of Triton's commercial affairs, including without limitation use on shipping boxes (if masked with ink, paint, tape, labels or otherwise obscured from view, an existing Triton, King Triton, or trident imprint on a shipping box will not be considered use), on containers, in letterheads, on checks, in advertisements, and on VHF radio or in other electronic or telephone communications during or concerning fishing operations.  Shipping boxes in which fish have been packed prior to 12:01 AM on July 4, 2000 which show Triton, King Triton or a trident imprint may be transported to Double E and further distributed by Double E without violating the injunction.  This

---

[71]A bond issued by a recognized surety in the penal sum of $40,000 might be used, but given the shortness of time, a deposit of funds will be required here.

27

preliminary injunction shall remain in effect until September 1, 2000, unless otherwise ordered. The parties shall submit a joint status report no later than August 14, 2000, advising whether this injunction should be vacated, modified, or extended.

IT IS FURTHER ORDERED, that the parties shall seriously consider whether this case can be settled with or without the aid of a settlement judge or mediator, and not later than August 14, 2000, counsel shall file a joint status report on settlement prospects which should include a request for a settlement conference or appointment of a mediator if either is deemed desirable.

Trident's motion to strike portions of Triton's affidavits at docket 10 is DENIED as moot.

DATED at Anchorage, Alaska this 30th day of June, 2000.

JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

A00-0180--CV (JWS)
------------------------------------------------
L. ALLINGHAM
W. DAWSON (ROBERTSON)

28